## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 11 2019, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

B.M., R.M., and K.M., Jr. (Minor Children)

and

T.M. (Mother) and K.M., Sr. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 11, 2019

Court of Appeals Case No. 18A-JT-1503

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Reneé A. Ferguson, Magistrate

Trial Court Cause No.
82D04-1709-JT-1637
82D04-1709-JT-1638
82D04-1709-JT-1639

**Tavitas, Judge.**

# Case Summary

T.M. ("Mother") and K.M., Sr. ("Father") appeal the trial court's termination of their parental rights to B.M., R.M., and K.M., Jr. (the "Children"). We affirm.

# Issue

Mother and Father raise one issue, which we restate as whether the evidence is sufficient to support the termination of their parental rights.

# Facts

In December 2014, the Vanderburgh County Office of the Department of Child Services ("DCS") was notified after Mother was hospitalized for threatening to commit suicide and kill her child, K.M., Jr. At the time, Mother was not receiving mental health treatment for her anxiety and depression. Mother tested positive for amphetamine use, and Adderall medication that was prescribed for K.M., Jr.'s attention-deficit hyperactivity disorder was missing.[1]

DCS removed eight-year-old K.M., Jr.[2] from Mother's and Father's care on December 6, 2014, "due to the lack of a caregiver to provide appropriate

---

[1] On drug screens, Adderall can register as a positive result for amphetamine.

[2] K.M., Jr. was eleven years old at the time of the evidentiary hearing on DCS' petition to terminate Mother's and Father's parental rights.

supervision." App. Vol. II p. 39. On December 9, 2014, the trial court conducted a detention hearing. The trial court deemed K.M., Jr.'s removal to be necessary; determined that detention was in K.M., Jr.'s best interest; and placed K.M., Jr. with a relative. That same day, DCS filed a petition alleging that K.M., Jr. was a child in need of services ("CHINS").

[5] At a hearing on December 16, 2014, Mother admitted to the allegations and Father stated that he had no objection to a CHINS determination. The trial court adjudicated K.M., Jr. as a CHINS. At a dispositional hearing on January 20, 2015, the trial court granted DCS' petition for parental participation as to Mother and ordered Mother to: (1) submit to random drug screens; (2) complete substance abuse evaluation and follow any treatment recommendations; (3) remain drug and alcohol free; (4) obtain a mental health assessment and evaluation to address her mental health needs and follow all treatment recommendations; (5) attend supervised or monitored visitation; (6) complete nurturing classes; (7) participate in case management services; and (8) comply with her parent aide. The trial court ordered Father to maintain contact with DCS.

[6] B.M. was born on August 7, 2015[3] and tested positive at birth for methamphetamine. DCS removed B.M. from Mother's and Father's care the following day. "At the time of [B.M.'s] birth, the parents had not been

---

[3] B.M. was two years old at the time of the evidentiary hearing on DCS' petition to terminate parental rights.

compliant" with the trial court's orders regarding K.M., Jr. Mother used methamphetamine during her pregnancy with B.M. and was noncompliant as to mental health services and visitation. *Id.* at 40. Father was enrolled in a work release program and, therefore, was unable to supervise and parent K.M., Jr. and B.M.

[7] On August 11, 2015, DCS filed a petition alleging that B.M. was a CHINS. Mother admitted B.M. was a CHINS on August 11, 2015, and Father agreed that B.M. was a CHINS on October 29, 2015. B.M. was adjudicated as a CHINS. The trial court subsequently ordered Mother and Father "to comply with specific services and to fulfill specific obligations as to [B.M.]." *Id.*

[8] On March 17, 2016, DCS removed the Children due to Mother's and Father's drug use. The Children were placed in foster care.

[9] R.M. was born on September 16, 2016,[4] and DCS removed R.M. from Mother's and Father's care at the hospital, "[d]ue to ongoing concerns for stability, illegal and impairing substance use by the parents, criminal activity by the parents, and mother's ongoing failure to address mental health issues." *Id.* at 41. On September 20, 2016, DCS filed a petition alleging that R.M. was a CHINS. The trial court adjudicated R.M. as a CHINS on December 13, 2016.

---

[4] R.M. was one year old at the time of the evidentiary hearing on DCS' petition to terminate parental rights.

[10]     After Mother's and Father's numerous arrests, relapses, and sustained non-compliance with the trial court's orders, DCS filed petitions to terminate Mother's and Father's parental rights to K.M., Jr. and B.M. in September and October 2016. The trial court granted Mother and Father additional time to comply with the trial court's orders. Subsequently, in November 2016 and December 2016, respectively, Mother and Father tested positive for narcotics.

[11]     On September 7, 2017, DCS filed petitions to terminate Mother's and Father's parental rights to the Children. The trial court conducted an evidentiary hearing on January 9 and February 26, 2018. In an order dated May 15, 2018, the trial court entered findings of fact and conclusions of law and terminated Mother's and Father's parental rights to the Children. The order provided in part:

> 1. [Each] [c]hild has been removed from his parents for more than six (6) months pursuant to the terms of the dispositional decree or the child has been removed from his parents' care for at least fifteen of the past twenty-two months, and
>
> 2. There is a reasonable probability that:
>
> > a. The conditions which resulted in [the] Child[ren]'s removal and continued placement outside the home will not be remedied;
> >
> > b. That continuation of the parent-child relationship poses a threat to [the] Child[ren]'s wellbeing.

3. Termination of parental rights is in [the] Child[ren]'s best interests.

4. There is a satisfactory plan for the care and treatment of [the] Child[ren], that being adoption.

*Id*. at 51. Mother and Father now appeal.

# Analysis

Mother and Father challenge the termination of their parental relationship with the Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office*, 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re. I.A.,* 934 N.E.2d 1127, 1132 (Ind.

Ct. App. 2010). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[14] Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)."[5] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Mother's and Father's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

---

[5] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

  (a)  Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

  (b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

[15]     Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B)    that one (1) of the following is true:
>
>> (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)   There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)    that termination is in the best interests of the child; and
>
> (D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

## I. *Probability that Removal Conditions Will Not be Remedied*

First, Mother and Father argue that DCS failed to establish, by clear and convincing evidence, that the conditions that led to the removal of the Children will not be remedied.[6] In order to prove this element, DCS must establish (1) what conditions led to DCS placing and retaining the children in foster care; and (2) whether there is a reasonable probability that those conditions will not be remedied. *I.A.,* 934 N.E.2d at 1134. When analyzing this issue, courts may consider not only the basis for the initial removal of the children, but also reasons for the continued placement of the children outside the home thereafter. *In re A.I.,* 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied.*

Courts must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed circumstances. *A.D.S. v. Indiana Dep't of Child Servs.,* 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied.* The parent's habitual patterns of conduct should be evaluated to determine the probability of future neglect or deprivation of the child. *Id.* Factors to consider include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack

---

[6] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We conclude there is sufficient evidence of a reasonable probability that the conditions resulting in the Children's removal from Mother's and Father's care would not be remedied, and we need not address whether there is sufficient evidence that continuation of the parent-child relationship posed a threat to the Children. *See A.D.S. v. Ind. Dep't of Child Services,* 987 N.E.2d 1150, 1158 n.6 (Ind. Ct. App. 2013), *trans. denied.*

of adequate housing and employment. *Id*. Courts also may consider services offered to the parent by DCS and the parent's responses to those services. *Id*. DCS is not required to prove a parent has no possibility of changing; it need only establish a reasonable probability that no change will occur. *Id*.

[18] The trial court found:

> 7. * * * * * Both [Mother and Father] have had significant incarceration during the pending CHINS matters, resulting in inability to attend visitation at times, inability to provide supervision and care to the children, and inability to maintain suitable housing.
>
> * * * * *
>
> 9. The parents were given additional time to demonstrate that they could achieve reunification. Although the parents began to make some improvements following the filing of termination of parental rights and were participating in visitation, mother again tested positive for narcotic substances without a prescription in November of 2016 and father tested positive for narcotic substances without a prescription in December of 2016.
>
> 10. In early 2017, the parents began to display increased non-compliance with programs and orders of the court. Between March and May 2017, mother missed approximately 18 drug screens and father was again in Community Corrections, where he was unable to assume care and placement of the children.
>
> * * * * *

12. The Father has not shown an ability to provide stability and care for the children throughout the CHINS matter. . . .

13. Father stopped participating in random drug screens in September of 2017 and has not demonstrated an ability to abide by Court orders, and more importantly, has not demonstrated sobriety. This is critical given his long history of substance use and his own report that he could [not] keep his children in his care due to his substance use.

14. The children's father had not visited with the children since September of 2017 as of the start of trial. . . .

15. Father has been arrested approximately seven times during the pending CHINS matters. Father was convicted of fraud for stealing a prescription pad from a medical provider. Father has been sentenced to work release due to probation violations, including a revocation based on a relapse on opiates. Father's petitions to revoke indicate that father has difficulty following orders of the court.

16. Of extreme concern to the court is that the parents were involved in a domestic altercation in October of 2017. . . .

17. In November of 2017, the parents participated in a court facilitation meeting geared toward giving the parents a final opportunity to avoid their parental rights being terminated. At that meeting, father stated that he could not provide care for the children on his own, that he would not participate in the services ordered by the court, and that he wanted to give custody to the mother. Father left the meeting and did not stay to its conclusion. . . .

18. Father now reports that he has been attending drug screens and seeking substance abuse treatment. Father failed to notify FCM [family case manager] that he was undertaking these efforts and did not notify the court facilitator. Additionally, evidence from a representative of the Father's treatment provider indicated that screens collected by them were for the sole purpose of monitoring compliance with Suboxone treatment and were not random; furthermore, father is no longer receiving treatment at their facility as of the time of trial.

19. The court has given consideration to father's current treatment but notes that father has attended substance abuse treatment previously, including inpatient treatment at Stepping Stone, and continued to use illegal and impairing substances after completing treatment.

* * * * *

22. Father reported on the last day of trial that he wants to be, and is ready to be, a dad now. The Court believes that Father has had three years to make the children a priority and has failed to do so. Father's pattern of behavior speaks more loudly than his words and the children should not have to wait any longer to determine if father is going to someday be able to be a consistent parent to them.

23. *Based on the evidence before the court, the court finds that father is not likely to remedy the reasons that each child has remained out of his care.* Father has not maintained a bond with the children in that father failed to take advantage of the opportunity to participate in visits with the children. Father does not know any information about current conditions or medical care, and has not made efforts to gain knowledge about the children. . . .

* * * * *

25. Likewise, Mother has no[t] shown an ability to care for the children in a safe and stable manner during the underlying CHINS matters.

26. Mother self-reports that she has been arrested approximately five to six times during the pending CHINS matter. Mother has had multiple petitions to revoke probation, including for relapse on opiates. Mother's petitions to revoke indicate that she has difficulty following orders of the court.

27. Mother stopped participating in random drug screens in October of 2017. . . .

28. Mother has been residing in the home of her step-father. DCS and CASA went to the home in fall of 2017 for a scheduled visit in an effort to determine if it might be appropriate for reunification. The home was found to be in disarray, with prescription bottles in plain view and a bong associated with drug use out in plain sight. . . .

29. At the facilitation meeting in November of 2017, mother admitted that she was only taking half of the depression medication that she was prescribed. Mother reported that she was willing to obtain the mental health treatment that had been ordered throughout the CHINS matter but had not been doing so. . . .

30. Mother claimed on the last day of trial that she would be starting mental health treatment the Wednesday after trial.

31. [ ] Mother has had three years to make the children a priority and has failed to do so. Mother is aware that she resides with

a person who uses illegal substances and who is likely to have illegal substances in her home. Mother has not been compliant with drug screens to demonstrate sobriety, which is a key factor considering her history of use. Most importantly, Mother still had not initiated mental health treatment as of the final day of trial. Mother continues to struggle with mental health conditions, which are the very thing that lead to the Department's intervention in 2014. *Based on these facts, the Court finds that Mother is unlikely to remedy the reasons that the children were removed from Mother and the reasons that the children have remained out of her care.*

\* \* \* \* \*

33. As with father, Mother's pattern of behavior speaks more loudly than her words and the children should not have to wait any longer to determine if mother is going to someday be able to be a consistent parent to them.

App. Vol. II pp. at 42-47 (emphasis added).

[19] The reasons for the Children's removal and continued placement outside Mother's and Father's care included Mother's mental health and Mother's and Father's substance abuse and instability. None of these conditions has been remedied, and there is a reasonable probability that these conditions will not be remedied in the future.

[20] First, Mother's mental health issues have not been resolved. DCS family case manager ("FCM") Crystal Hobgood testified that, after Mother threatened to commit suicide, Mother was ordered to get a mental health evaluation and to follow any resulting recommendations; Mother "never did complete [the

mental health evaluation]." Tr. Vol. II p. 67. Hobgood testified that, when pressed by DCS, "[Mother] would just basically say that she could handle it and that she was gonna take care of it on her own." *Id*. at 81-82. The record establishes that Mother finally submitted to the mental health evaluation "two and a half, three weeks" before the evidentiary hearing. *Id.* at 77. Mother testified that she would "start counseling on [the] Wednesday" following the evidentiary hearing on DCS' petition to terminate parental rights. *Id*. at 178.

[21] Next, Mother's and Father's substance abuse issues also remain unresolved. For much of the three-year pendency of the CHINS matters, neither Mother nor Father achieved demonstrable, sustained sobriety. FCM Salome Lamarche testified that, as to drug screens, Father "was pretty much non-compliant the whole time"; and Mother "did comply the first few months" before becoming "less complian[t]." *Id*. at 91. FCM Kassidy McGee testified that Mother's and Father's compliance with random drug screens was "sporadic," and neither achieved sobriety on McGee's watch. *Id*. at 100. McGee also testified that Mother and Father were suspended from intensive outpatient treatment "for non-compliance." *Id*. at 103.

[22] Further, Mother and Father's substance abuse resulted in multiple arrests and periods of incarceration. Mother and Father were each arrested at least five times during the pendency of the CHINS matters. On one occasion, Mother was arrested for presenting a diluted urine sample during drug testing. FCM Hobgood testified as follows:

[Mother] was testin' positive for Lortabs and opiates with her probation officer. She tested positive several times. She actually [was] with the parent aide a few times and the parent aide had to take [B.M.] back to [Father] because [Mother] was arrested. That happened several times. The last time she was arrested the probation officer said that they thought that she was gonna have a long sentence. So at that time my supervisor and I had met with [Father] at his place and discussed some services that we could put in the home to help him so that he could work . . . . So we were tryin' to establish some services to help him, such as daycare, etcetera, so that he can maintain his job. That day . . . he had agreed to the services but later that afternoon he had called and asked me to remove his children.

*Id*. at 63-64. Hobgood testified that, despite DCS' offer of support services, Father called within an hour to say that "he didn't think that he can handle all the children and that he knew that he would use Lortabs and that he wanted us – even though he said that it was very difficult on him . . . he felt that it was better for the children to be removed." *Id*. at 65.

[23] Specifically, as to Father's own substance abuse, FCM Hobgood testified that, despite "opportunities to make up," Father "did not follow through" and "didn't complete the last phase of substance abuse treatment." *Id*. at 92. Hobgood testified that, on one occasion, after Father tested positive for opiates and Oxycontin, DCS agreed to pay for him to enroll in the Stepping Stone program. Hobgood testified that "when a bed [be]came available[,] . . . . Father refused and said he didn't wanna do that treatment." *Id*. at 66. During the

CHINS pendency, Father tested positive for oxycodone, hydrocodone, hydromorphone, benzodiazepine, and morphine.[7]

[24] Although Father testified, at the evidentiary hearing, that he completed substance abuse treatment at SelfRefind[8] and submitted to drug screens, Father failed to provide documentation to DCS of his enrollment, progress, or test results. Moreover, the testimony of both Father and Bailee Edmond, who conducted Father's drug screens, established that Father's drug testing at SelfRefind was scheduled, predictably, every Tuesday. As FCM McGee testified, persons who present only sporadically for drug screens "c[an] still be active users" and "c[an] screen one week and . . . miss four weeks [while] using [drugs] those four weeks." *Id*. at 102.

[25] Additionally, Mother's and Father's instability has not been resolved. FCM Hobgood testified that Mother and Father were referred to the intensive Home Builders program "to help them keep the kids in the home, [and to] help them with identifying treatment programs, jobs"; however, services were terminated after forty-five days because Mother and Father did not meet consistently with Home Builders staff and "wouldn't comply[.]" *Id*. at 62. Hobgood testified that, after a forty-five-day enrollment in services, Mother and Father "weren't

---

[7] Lamarche testified that Father had a prescription for "[o]ne of them." Tr. Vol. II p. 92.

[8] SelfRefind is an outpatient mental health and substance abuse support program.

able to accomplish the goals," and DCS "ended up removin[g] the children due to [Mother's and Father's] positive drug screens." *Id*. at 63.

[26] Another issue of concern for DCS was Mother's and Father's housing instability and their inability to maintain consistent living conditions fit for the Children. Despite DCS' rent assistance, Mother and Father were evicted from their residence "a couple of times" during the pendency of the CHINS matters. *Id*. at 139. Hobgood testified that Mother was in and out of jail[9] and that, during one of Mother's incarcerations, Father had the opportunity to keep the children in his home and to keep them from going into foster care. Hobgood testified that, after initially agreeing to the plan, Father opted out, and DCS removed the Children. Due to a domestic abuse incident in September 2017, during the pendency, Mother and Father separated. Mother moved in with her stepfather, who self-reported his regular marijuana use and, in whose home FCM McGee observed a bong and prescription medication bottles in plain view.

[27] FCM McGee testified that DCS pursued termination of Father's parental rights "due to [his] unwillingness to participate in services"; and because Father "admitted he can't care for all three kiddos." *Id*. at 112. McGee testified

---

[9] Hobgood testified that, from March through August 2016, Mother was "[o]ff and on" in jail, and "fairly most of April to August[, Mother] was in jail." Tr. Vol. II p. 76.

further that DCS sought termination of Mother's parental rights because Mother "didn't fully comply, which . . . would've meant doing all of her drug screens, not missing visits, and doing mental health services. And there was no compliance." *Id*. at 109. McGee testified that her stance as to Mother would not change, even if Mother completed substance abuse treatment,[10] because "[i]t's been three years and there has been no stability so there's nothing that would make me think that it's gonna change now, especially in a short amount of time." *Id*. at 112.

[28] The record reveals that Mother and Father occasionally made progress during the pendency of the CHINS matters. Unfortunately, three years later, Mother and Father simply failed to demonstrate that they could provide a safe, secure, and stable environment for the Children. We acknowledge the hurdles inherent in overcoming drug addiction; however, we cannot overlook Mother's and Father's patterns of abusing drugs, complacency, pursuing substance abuse treatment, relapsing, and going to jail. *See A.D.S.,* 987 N.E.2d at 1157 (holding that the parent's habitual patterns of conduct should be evaluated to determine the probability of future neglect or deprivation of the child); *see id.* (holding that DCS is not required to prove a parent has no possibility of changing; DCS need only establish a reasonable probability that no change will occur). As the trial court stated, "the children should not have to wait any longer to determine if

---

[10] Mother did complete substance abuse treatment.

[Mother or Father are] going to someday be able to be consistent parent[s] to them." App. Vol. II p. 47.

[29] Based on the foregoing, we find that DCS presented sufficient evidence to establish, by clear and convincing evidence, that a reasonable probability exists that the conditions resulting in the Children's removal or the reasons for placement outside Mother's and Father's care will not be remedied. The trial court's finding in this regard is not clearly erroneous.

## II. Best Interests of the Children

[30] Next, Mother and Father assert that DCS failed to prove that termination of their parental rights is in the Children's best interests. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *D.D.,* 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.*

[31] Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *K.T.K.,* 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

[32] A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that

termination is in the best interest of the child. *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers and evidence that the conditions resulting in removal will not be remedied are sufficient to show, by clear and convincing evidence, that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[33] The trial court found:

> 1. Each child is in need of a stable, sober caregiver who can advocate for the child and give the child a permanent home. The Court does not believe, based on either parent's pattern of ongoing behavior, that either of them are [sic] able to serve those roles for the child.
>
> 2. The CASA and DCS family case managers involved the parents in numerous Child and Family Team meetings in an effort to help the parents remain on the path to reunification. Despite these efforts and the services provided, the parents have not shown a commitment to reunification. As the CASA volunteer noted, these children deserve better. Children need stability, consistency, they need to feel wanted and loved, to have a roof over their head, and food on table. They need boundaries to feel secure. These are the exact types of things that the parents have not been able to provide and which lead the Court to find that termination of parental rights is in the best interests of the children.

App. Vol. II p. 48.

[34] At the evidentiary hearing, FCM McGee testified that termination of Mother's and Father's parental rights is in the Children's best interests "[s]o the[ ] [Children] have a safe and stable home to grow up in." Tr. Vol. II p. 108.

McGee testified that K.M., Jr. and B.M. have special medical or mental health needs and that the Children all need a caregiver "that can show stability and sobriety." *Id*. at 109.

[35] FCM Katharine Thien testified that she recommended termination of Mother's and Father's parental rights because, three years after being court ordered to do so, Mother had yet to complete vital mental health treatment; and Father failed to satisfactorily complete substance abuse treatment. CASA Michael Huther testified that Mother and Father "lack the stability necessary to maintain a household for the kids"; and that Huther could not recommend reunification "[b]ecause of the non-compliance with the expectations that the DCS has required of [Mother and Father]." *Id*. at 139.

[36] The totality of the evidence supports the trial court's determination that DCS proved, by clear and convincing evidence, that termination is in the Children's best interests. Accordingly, the trial court's finding on this issue is not clearly erroneous.

### III. Satisfactory Plan

[37] Lastly, Mother and Father allege that DCS failed to prove, by clear and convincing evidence, that there is a satisfactory plan for the care and treatment of the Children. "DCS must provide sufficient evidence there is a satisfactory plan for the care and treatment of the child." *In re J.C.,* 994 N.E.2d 278, 290 (Ind. Ct. App. 2013) (citing Ind. Code § 31-35-2-4(b)(1)(D)), *reh'g denied.* The

plan need not be detailed, provided that it offers a general sense of the direction in which the child will go, upon termination of the parent-child relationship. *Id.*

[38] The trial court found:

> 3. DCS did consider the possibility of relative care for the children in hopes that a less restrictive option could be found for the child, and relative placement was used early on in the case. The child's maternal grandmother subsequently tested positive for substances, resulting in removal from her care prior to the trial home visit with the parents in November of 2015. Other appropriate relatives have not been found.
>
> 4. The court acknowledges that while the youngest child is in pre-adoptive placement, the current foster homes for the oldest two are only foster homes and are not likely to adopt the children. However, the Special Needs Adoption Program matches children to adoptive families and the children will be eligible for consideration by potential families if parental rights are terminated. Both the Court Appointed Special Advocate (CASA) and the family case manager believe that the children are adoptable. The court agrees that adoption for the children is best sought now rather than the children being at a more advanced age were parents to be given more time to try to complete services.
>
> 5. DCS and the CASA volunteer recommend adoption as the plan of care which is in the children's best interest. The Court finds that adoption is in each child's best interests based on the behavior of the parents, and that adoption is a satisfactory plan.

App. Vol. II p. 48.

DCS is only required to offer a general sense of the plan for the Children after termination of Mother's and Father's parental rights. Here, FCM McGee and CASA Huther testified that adoption is the most appropriate plan of care for the Children and that each child is "adoptable." *Id.*; *see Lang v. Starke Cnty. Office of Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007) (holding that adoption is a satisfactory plan), *trans. denied*. We find that DCS proved, by clear and convincing evidence, that it has a satisfactory plan for the care and treatment of the Children; accordingly, the trial court's finding on this issue is not clearly erroneous.

## Conclusion

The evidence is sufficient to support the termination of Mother's and Father's parental rights to the Children. We affirm.

Affirmed.

Baker, J., and May, J., concur.